In re THIRD AVE. TRANSIT CORP. et al.
MELNIKER et al. v. LEHMAN et al.

No. 101, Docket No. 22099.

United States Court of Appeals
Second Circuit.

July 10, 1952.

Hays, St. John, Abramson & Schulman, Robert Irving Lenox, New York City (Edward M. Garlock and Osmond K. Fraenkel, New York City, of counsel), for appellants.

Saxe, Bacon, O'Shea & Bryan, New York City (William J. O'Shea, Edward D. Burns, James J. Geraghty and John A. Kiser, New York City, of counsel), for appellees.

Roger S. Foster, David Ferber, Lawrence M. Greene and Robert L. Randall, Washington, D. C., for Securities and Exchange Commission.

Harold P. Seligson, New York City, for First Mortgage Bondholders.

Before AUGUSTUS N. HAND, CLARK and FRANK, Circuit Judges.

FRANK, Circuit Judge.

The bankruptcy court had the power, in appropriate circumstances, under Section 116, sub. 2 of the Bankruptcy Act, to authorize the borrowing of money, from voluntary lenders, on trustees' certificates, having a lien on mortgage assets superior to previously existing mortgage liens.[3] To substitute for the use of that power—which itself must be most cautious-

---

**3.** This section, 11 U.S.C.A. § 516, sub. 2, provides that the court may "authorize a receiver, trustee, or debtor in possession, upon such notice as the judge may prescribe and upon cause shown, to issue certificates of indebtedness for cash, property, or other consideration approved by the judge, upon such terms and conditions and with such security and priority in payment over existing obligations, secured or unsecured, as in the particular case may be equitable."

ly employed [4]—the court's far more drastic power under Section 257,[5] requires proof of the most extraordinary circumstances— see R. F. C. v. Kaplan, 1 Cir., 185 F.2d 791, 795 [6] not present here.[7] We think that power is not limited to mortgaged or pledged assets coming into the hands of the mortgagee or pledgee [8] after default. But we believe that that power should never be exercised absent findings, based on the clearest evidence, not only that it is imperative to obtain the funds and that they cannot be obtained, on reasonable terms, first, by bank loans or second, by the disposal of certificates under Section 116, sub. 2, through ordinary market channels to voluntary lenders,[9] but also that there is a high degree of likelihood (a) that the debtor can be reorganized in accordance with the Act,[10] within a reasonable time,

---

4. In re Prima Co., 7 Cir., 88 F.2d 785, 790, 116 A.L.R. 766; 6 Collier, Bankruptcy (14th ed.) § 3.26.

5. This section, 11 U.S.C.A. § 657, provides that the bankruptcy trustee shall "have the right to immediate possession of all property of the debtor in the possession of a * * * mortgagee under a mortgage."

   Cf. Section 111, 11 U.S.C.A. § 511, which gives the court "exclusive jurisdiction of the debtor and its property, wherever located."

6. There the Court concluded: "Bearing in mind the objective of Chapter X proceedings, there is no a priori reason for supposing that Congress, in defining the powers of the reorganization court, would give a preferred status to secured creditors having possession of pledged collateral or other personal property, as against secured creditors who have taken possession under a defaulted real estate or chattel mortgage. See 6 Collier, Bankruptcy (14th ed.) § 14.03(2). The authorities, though we have found none precisely on all fours, seem to indicate that no such distinction is taken. * * * *"

   Among the cases cited by the court are Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110; In re Prudence Bonds Corp., 2 Cir., 77 F.2d 328; In re Moulding-Brownell Corporation, 7 Cir., 101 F.2d 664; In re Philadelphia & Reading Coal & Iron Co., 3 Cir., 117 F.2d 976.

   See 6 Collier (14th ed.) § 14.03(2); "In an earlier discussion, we saw that the reorganization court's summary jurisdiction extends to property in the hands of a pledgee as well as of a mortgagee; that viewed in the context of Chapter X the secured creditor cannot claim adversely as against the reorganization court merely on the basis of possession; and that any other result would defeat the very purposes of the proceeding, which contemplates the possible alteration or modification of secured debts as well as unsecured. In this aspect pledged property cannot be distinguished from mortgaged property. Accordingly, it is well settled that pledgees in possession may be enjoined summarily, if necessary, from disposing of the security or the income therefore by virtue of a sale. If this is so, then there is no apparent reason why the reorganization court may not summarily recapture possession where the needs of reorganization warrant."

7. In the Kaplan case, the district court had already found that a filed reorganization plan was "fair, equitable, and feasible". It also found that the value of the assets substantially exceeded the secured debt owing to the Reconstruction Finance Corporation, the secured creditor, as well as the debtor's unsecured indebtedness, and that the action to be taken under Section 257 would substantially improve the "position and security" of the R. F. C. Thus the R. F. C.'s holdings, consisting of deteriorated and incomplete watches, were turned over to be processed and prepared for the Christmastime retail market. In that way, needed cash from their sale would be furnished the reorganized company. Moreover, the sale proceeds, except for expenses incidental to the sales, would be put into a special account for the R. F. C.'s benefit. Compare the situation here where cash and not a batch of watches was turned over; unlike the R. F. C.'s tangible inventory security, the cash could be readily dissipated by improvident trustees, leaving the bondholders nothing of any substantial value in return.

8. Or an indenture trustee.

9. Indeed, if, in the ordinary market, funds can be procured only on severe terms, that fact will often throw light on the likelihood of reorganization (as to which, see infra).

10. This means, of course, a plan which will be feasible as well as fair and equitable.

and (b) that the secured creditors whose security is being compulsorily loaned will not be injured.[11] The reorganization trustees here had the burden of proving all these matters. They did not discharge that burden.[12]

The first mortgage bondholders should not have had their security put at risk in order to increase the "elusive equity" [13] of junior creditors or stockholders, for those junior interests possess no right to a "run for other people's money".[14] To direct enforced lending of the sort ordered here may yield these undesirable results: (a) The zeal of the reorganization trustees to make only the most prudent expenditures may be blunted. (b) There may well be undue delay of what may be inevitable liquidation. (c) The judge loses the opportunity to learn, in a significant way, the detached attitude of the commercial world towards the value of the assets.[15]

As the debtor is a public utility, the judge properly took into account the factor of the public interest in the debtor's continued operations. That, however, is but one factor; it must not be allowed to outweigh all others. There are strict limits to the extent to which, in reorganization proceedings, the interests of creditors (or of a particular class of creditors) may be sacrificed to the public interest; to exceed those limits is (to say the least) to come dangerously close to the edge of unconstitutional taking of property, a line from which courts should keep away if possible. The reorganization judge should not compel a marked sacrifice of that kind, without first deciding, on substantial evidence, whether the interest of the creditors who would be affected by the sacrifice does not demand that prompt steps be taken to bring about abandonment of the utility's operations, including steps to procure the consent of those public authorities (if any) whose consent to abandonment is required.[16]

11. Cf. In re Prima Co., 7 Cir., 88 F.2d 785, 790; In re Avon Dress Co., 2 Cir., 79 F.2d 337–338; In re Franklin Garden Apartments, Inc., 2 Cir., 124 F.2d 451, 454; In re Solar Manufacturing Co., 3 Cir., 176 F.2d 493; Bankers Trust Co. v. Gebhart, 2 Cir., 195 F.2d 238.

12. As to some of these matters, the judge, in the early part of the hearing, recognized that the burden was on the reorganization trustees. The judge said:

"Mr. Seligson, isn't the question as to whether or not the taking of this cash from the mortgagee, the indenture trustee, will be of harm to the first mortgage bondholders, predicated on the value of the physical assets covered by the mortgage? Isn't that the real question to be determined and isn't that the only question to be determined? * * * The question, it seems to me, therefore, to be determined is as to what is the value of the physical assets covered by this mortgage. If there is reasonable prospect that there is sufficient to pay those first mortgage bonds, then the property must be continued for the benefit of the second mortgage bondholders, general creditors and stockholders. I think that is the question on which testimony will be received. * * * I think we will proceed and take some evidence on the assets covered by the mortgage and its value as a going concern, so as to determine to what extent there would be harm or damage to the first mortgage bondholders if this money were used."

Subsequently in the hearing, however, the court made remarks indicating that he thought the burden of proof was on those opposing the reorganization trustees.

13. In re Franklin Garden Apartments, Inc., 2 Cir., 124 F.2d 451, 454.

14. Cf. Ladd v. Brickley, 1 Cir., 158 F.2d 212, 216.

15. Although our decision here would be the same in the absence of the following facts, we think it important that they be noted: (1) The terms of the certificate issued to the involuntary lender—i.e., the noncommercial interest rate and the lack of a fixed maturity date—were peculiarly unfortunate. (2) Notice of the hearing should have been given to all the first mortgage bondholders. There was time to give such notice, since the debtor's precarious financial condition had long been obvious. Although there was no such notice, the judge stressed and in part relied on the attitude of most of those bondholders present at the hearing.

16. Cf. Bankers Trust Co. v. Gebhart, 2 Cir., 195 F.2d 238; Georgia Power Co. v. City of Decatur, 281 U.S. 505, 508, 50 S. Ct. 369, 74 L.Ed. 999; Railroad Commis-

As the record here is barren of essential findings (and of evidence to support them) of the kind of facts found in the Kaplan case,[17] we think the judge "abused" his discretion.

Reversed.

sion v. Eastern Texas Railroad Co., 264 U.S. 79, 85, 44 S.Ct. 247, 68 L.Ed. 569; Bullock v. State of Florida ex rel. Railroad Commission of State of Florida, 254 U.S. 513, 520–521, 41 S.Ct. 193, 65 L.Ed. 380.

17. See note 6 supra.